Our third case is Nissenbaum v. Jennings. Mr. Levin, whenever you're ready. Thank you, Your Honor. May it please the court, my name is James Levin. In this case, the state extended a very generous and lenient plea proposal for probation. Instead of taking that proposal, Nissenbaum went to trial, was convicted, and was sentenced to 14 years in prison. Had Nissenbaum received competent advice under the first prong of Strickland, i.e., had he known there was a very, very strong probability he'd be convicted and that he would receive a mandatory minimum of 12 years in prison, had he known that from trial counsel, there is a reasonable probability, meaning less than the preponderance of the evidence or less than 50 percent, a level sufficient to undermine confidence in the outcome, that he would have taken the deal and that the deal would have been entered by the judge and he would have received a sentence of probation. Counsel, that reasonable probability, you said plea proposal. Let's start there, right? Because I think we need to decide if there was a reasonable, and giving a deeper deference to the state court, whether there was a reasonable probability that that plea even would have formally been offered. That's the first step that we need to get to, and then, okay, would your client have accepted it? Would the court have accepted it? Was there ever a firm offer on the table? That would answer the question. Well, Your Honor, there wasn't a firm offer on the table, but had Nissenbaum received effective assistance, there is a reasonable probability, sufficient to undermine confidence in the outcome, that a formalized offer would have been extended on April 11th at the hearing to enter a deal involving the terms, which means dismissal of the charges, accept aggravated domestic battery, which he would have pled to, and a sentence of probation. So, there's a reasonable probability the offer would have been formalized. ASA Bagby testified that if Nissenbaum had accepted her proposal, she would have entered a deal that day. I don't think she testified she would have entered that deal, correct? She would have entered a deal that she had proposed, which was probation and dismissal of the charges and a plea to aggravated domestic battery. Where is that in the record? Where is that in the record? I think that's the big problem here, is that there's no testimony to support that. She would have talked to the victim, the victim would have rejected it, and that would have been the end of the deal. But the victim didn't appear at the April 11th hearing. I know, but where did the prosecutor testify that she would have offered? Because you do have to establish that the prosecutor would have actually offered the deal. And where can I find in the record the prosecutor's testimony that she would have formally offered that deal on April 11th? Under the strictness standard, it's a reasonable probability. So, the would-have standard is we would respectfully contend it's not. I'm just quoting directly from deletory v. United States. The prosecutor would have actually offered him a deal. Under the deletory case, it's a reasonable standard, a reasonable probability standard under Strickland, and that reasonable probability exists, given ASA Bagby's testimony and her email, that she would have entered a deal on April 11th, even if DK was not happy with it, because that's what she said in her email. And that deal, there's a reasonable probability, less than 50%, by less than the preponderance of the evidence, sufficient to undermine confidence in the outcome, that a plea would have been entered. And I would ask the court to review ASA Bagby's testimony and the actual email that she sent, stating that she would have entered a deal that day, even if DK was not happy with it. DK didn't show up at the hearing on April 11th, and the deal was still on the table on April 11th. Well, wait a minute. I thought the facts were that the prosecutor talked to the victim on April 11th, and immediately withdrew that informal offer on April 11th after talking to the victim, saying, there's no way I'm going to offer this. The victim will not go along with this. That was after court. But what ASA Bagby testified is that during court on April 11th, DK did not appear, and ASA Bagby testified that Nissenbaum would have, if Nissenbaum had accepted the deal for probation, she would have entered in court that day on April 11th. That's before, because DK did not show up to the hearing. So the offer wasn't withdrawn until after the hearing. If the deal had been entered at the hearing, it would have been too late for it to be withdrawn. She didn't make a formal offer, though. I'm not familiar with the way the state court proceeding happens here, but wouldn't it be a written agreement? Or would they just appear in front of the judge in the status conference and just plead guilty without a written, prosecutors tell the judge the terms, defendant would agree to the terms? I mean, I've never heard of a state court operating like that. Well, there's nothing in the record that states that a written agreement would be required. Formal, formal. Forget written, formal. Well, formal being that the terms would be agreed to. But what I'm saying is a reasonable probability exists that it would have been formalized at the hearing had Nissenbaum known that he almost certainly would be convicted and he definitely would have to serve a mandatory minimum of 12 years. That's certainly infinitely better than, infinitely worse than getting probation or no prison time. So had Nissenbaum known these things, there is a reasonable probability he would have taken the deal and it would have been formalized on April 11th via ASA Bagby's testimony on that point. So we are arguing in this case that the de novo standard of review applies to both prongs, the performance prong and the prejudice prong. So the de novo standard of review applies on the performance prong because the appellate court specifically stated that they would decline to address whether or not there was deficient performance. So under Thomas v. Clemens and all the other cases we cite, the Supreme Court cases and the Seventh Circuit cases, de novo review applies. As to the prejudice prong, we are also arguing for de novo review because the state appellate court used an improper standard, a standard, a legal standard that conflicts or contradicts Strickland. So because the state appellate court violated established law under Strickland. Did they use it in application or did they just simply state the wrong standard one time in its opinion? Because we've seen this before where the appellate court states the proper standard several times. The state court seems to apply the proper standard but then at the end of the opinion in a conclusion or something like that, the state court states the improper standard, which I think is what happened here. That's the Viscati situation, the Supreme Court decision. But this case is markedly different from that Supreme Court decision because the state appellate court didn't just use the improper standard in the conclusion. They repeated the improper standard each and every time, five times, because in all five instances and the conclusion, they tied the reasonable probability standard to the manifest weight of the evidence standard. Whereas Strickland says that the prejudice, the ultimate decision as to whether or not the defendant was prejudiced, is a mixed question of law and fact. Whereas this manifest weight of this evidence standard is a purely factual inquiry. And the fact that the appellate court repeated it six times and said whether or not the trial court's finding was against the manifest weight of the evidence. And I believe I did ask for three months. You did, you did. Yeah, you're in your rebuttal time. You want to save the rest of your time? Please, Your Honor. Thank you so much. You're very welcome. Okay, Mr. Skiba, we'll hear from you.  Good morning, Your Honors. Counsel, may it please the court. I'm Assistant Attorney General Matt Skiba on behalf of the respondent warden. I'd like to jump right to prejudice with Your Honor's permission. Could you start with the standard review? Sure, certainly, Your Honor. So this case comes to this court after a decision on the merits from the state court. So Section 2254. I'm familiar with all that. I'm talking about what Mr. Levin was talking about, manifest weight of the evidence, because there is that little problem here. And it is a closer question, I think, if we don't defer to the state court on Mr. Levin's merits argument. Well, I would point, Your Honors, to the first paragraph or the first page of the appellate court's decision. This is the first page of the appendix where it's quite clear that the appellate court did not apply the reasonable probability standard to the overarching legal question of prejudice. I think that the best way to read the appellate court's decision is that it only applied the manifest weight standard to factual questions, including a key factual question here, and that's on petitioner's credibility and his willingness to accept a plea. Six other instances the state court recited the reasonable probability standard, I believe recited the Frey and Laffler standard verbatim. My friend's only challenge to the contrary is at the very end of the appellate court's decision, but I would have two points to make on that, Your Honor. That recitation was not inaccurate, and at most it was imprecise. It's not inaccurate because if you read the appellate court's decision in the context of the trial court's credibility determinations, in essence what the trial court and the appellate court both found is there is no probability that petitioner would have accepted this vague tentative proposal because he didn't want a felony and he wanted to go to trial. But as I mentioned, at most that's one instance of imprecision. That's not enough to rebut the presumption that the appellate court knew and followed the law. As this court's decisions recognize ad nauseum, this court needs to give the state court the benefit of the doubt. And I would just point, Your Honors, to the Seventh Circuit's case, Al-Khalidi v. Neal, which we cite in our brief, where this court in essence used the exact same shorthand that the appellate court did here, where this court said, quote, the petitioner has not established he would have accepted the plea. So for those reasons, this is not a contrary to problem. Turning to the unreasonable application prong problem, I think my friend's argument is mostly one for error correction. But respectfully, the time for error correction is over. That happened in the state direct appeal and the appeal later to the Supreme Court. The standard under Section 2254D on the unreasonable application prong is, was the state court's decision so obviously wrong that it's beyond any fair-minded disagreement? And for two reasons, for two fairly straightforward reasons, this was not an unreasonable application of clearly established law. The first is it's undisputed at this point that there wasn't a formal plea offer on the table. What the appellate court called this is only a tentative and vague proposal. And so therefore, this case is one step removed from Frye and Laffler. Both of those cases involve formal plea offers. Frye, for instance, was a, quote, formal offer with a, quote, fixed expiration date and documented terms. And we simply don't have that here. And as this court recognized in De La Torre, a petitioner without the, excuse me, a defendant without a formal plea offer cannot rely on Frye and Laffler where there's not a formal plea offer on the table. And so for that reason, this case cannot, the state court's decision cannot be an unreasonable application of clearly established law because clearly established law just simply doesn't speak to this scenario here. And setting that aside, even if this court could reach the prejudice inquiry despite the absence of a formal offer, on these facts, the prejudice inquiry would be too speculative. This court would have to take on faith that during the key window between March 23rd, where Bagby texted this vague proposal, and April 11th, where she met with the victim here, that there would have needed to be an offer that was acceptable to petitioner, that negotiations would have progressed to the point where they would have discussed things like the length of probation, the length of the mandatory custody time that was between 60 days and six months, as well as the other ancillary terms and conditions like counseling and restitution. There's no reason that things would have progressed that smoothly. To the contrary, even if petitioner was amenable to this vague formal plea offer and the trial courts found that he would have not been amenable to that offer, there's no reason that things would have progressed that smoothly. What the trial court said here is that negotiations were very difficult for a variety of reasons, in part because petitioner was intractable. Your Honors asked what would have been necessary for Bagby to firm up the plea offer. I would invite Your Honors to look at pages 13 and 14 of our briefs, where essentially what Bagby was asked is, if petitioner would have come to the state and said, we will take two years of probation, 60 days of jail time, a two-year order of protection, and whatever conditions Bagby wanted, Bagby replied that at that point she would have firmed up the deal and they would have been ready to present to the trial court. But there's too many ifs in that scenario. Again, petitioner was unwilling to accept a plea deal, but regardless there's no reason to believe he would have accepted it prior to this key April 11th date. And turning to that point, both the state trial court and the state appellate court found petitioner incredible on his willingness to accept a plea offer. What the trial court said after hearing petitioner's testimony is petitioner, quote, did not want an offer and, quote, wanted to proceed to trial. The appellate court further found, crediting Michelle Truesdale's testimony, that the petitioner did not want a felony. And even if there's a conceivably other reasonable reading of the record, Section 2254E requires that this court defer to the state court's factual findings absent clear and convincing evidence to the contrary. Petitioner cannot come forward with clear and convincing evidence to the contrary. Again, the state trial court heard live testimony of all parties and was in the best position to make these factual findings. And finally, I would just note on this point, it's pretty telling that petitioner knew he was facing at least six years in jail, six to 30 years in jail, and even under the most generous reading of the record. How did he know that? He conceded that he knew the six to 30 in the state evidentiary hearing. What he alleges is counsel never told me that, in fact, I was facing mandatory consecutive sentencing on the deficient performance prong. Because the state trial court found a gap in the record on that basis, petitioner necessarily can't rebut the presumption of reasonable assistance. But, again, he knew that he was facing at least six to 30 years. He didn't run to the prosecutor and said, I will take it, I will take whatever additional terms you would have. Even under the most generous reading of the record, petitioner testified that he told Truesdale that he would talk to his family before April 11th, and he didn't even do that. There's no evidence that he did that. Was he ever told of the possibility of consecutive sentences by his counsel? Certainly, counsel testified that she advised him of consecutive sentences as early as December 2016, where she showed him the annotated charging instruments. There is differing testimony by petitioner and Truesdale. At the end of the day, the state trial court was left with uncertainty. It was clear to the state trial court that petitioner was confused about the sentencing range, but after hearing the live testimony of both petitioner and Truesdale, it was left unclear as to exactly why petitioner was confused, whether it was his own confusion or whether a failing on Truesdale's part. And because of that gap. The trial court was somewhat disturbed by counsel's testimony at the hearing, too, wasn't he? That's right, Your Honor, and certainly the text message between her and Bagby in the middle of trial was not a good look, but that was all before the state trial court. The state trial court cited that as a factor pointing to petitioner's version of events, but still there was kind of veiling. We're all here today because the trial court was sloppy, right? The trial court, Your Honor? It was sloppy. As to the performance problem? In making the findings the trial court had to make. No, Your Honor. I mean, certainly the credibility findings and the factual findings that the trial court made were accepted by the appellate court as credible, or at the very least petitioner hadn't overcome the factual findings of the state court. And so the question here, again, is whether petitioner could overcome the re-litigation bars of Section 2254-D1. We've got two very mediocre state court opinions here. That's our problem, right? Trial court and appellate court, both of them messed up. And as a result, you've got a problem. With respect, Your Honor, even if Your Honor is correct that they were sloppily written opinions, the question under de-deference is beyond just the way that the appellate court and the trial court wrote their opinion, was their ultimate judgment so out of bounds as to beyond? In other words, we have this congressional determination, at least as interpreted by the Supreme Court, that we have to tolerate a certain degree of sloppiness. Yes, Your Honor, because this court defers to the judgment and not the particular reasoning of the state court. And I would even point, Your Honors, to cases like Primo. I'm sorry. I see that I'm out of time. It reflects. I would point, Your Honors, to Primo v. Moore where the Supreme Court said that even if it's not clear that which prong the state court relied on or if they gave no reasoning at all, de-deference still applies. So for those reasons, we ask the court to affirm. Okay, thank you. Mr. Levin, you have rebuttal time. You asked for two minutes. We'll give you two minutes. Your Honor, the state's argument assumes a deferential standard of review. They use language arguing for a deferential standard of review, but that's a presumption I would request the court not make here. The standard of review here is de novo. Mr. Levin, do you think, can you win if we apply the deferential standard of review? We could prevail under both standards of review, the deferential and de novo, but I would argue here for the de novo standard of review. And Your Honor asked me a question during the opening about whether it was just in the conclusion that the appellate court used the improper manifest way of the evidence. I would ask the court to look at page 29 of my opening brief, and in the first paragraph there, we cite the state appellate court opinion at paragraph 48, 53, 55, and 60, and the conclusion. And in all those instances, the state appellate court used an improper standard of review linked to the improper manifest way to the evidence standard. And as concerning the consecutive sentences, the trial attorney testified, this is her own testimony, that she didn't know what consecutive sentences were. And she asked in the email to the ASA Bagby about mandatory consecutive sentences, so she didn't know what they were at the trial. And on the testimony, this is cited in the brief, in her testimony, she didn't understand what mandatory consecutive sentences were. Yeah, and one of the problems with that, though, is your client's testimony that he did not want to plead guilty to a sex offense. He was not going to plead guilty to a sex offense, and the prosecutor said, after I talked to the victim, that's all that was going to be offered because that's what this case was. Well, the original plea offer was for... But you're saying it's a plea offer as a text message, saying, I mean, that happens all the time in criminal law. Would your client entertain a plea to the following? Yes, he would. That doesn't mean even that he's going to get that offer. That's just a negotiation. There's a big difference between a negotiation and a formal offer in plea negotiations. But ASA Bagby testified at the hearing... ...that she would have entered into a plea agreement on that day, but she doesn't testify that she would have entered into that plea agreement. That's a big, big difference. She testified that she would have entered the plea on the aggravated domestic battery, and that means Nissenbaum would have got what he wanted. No, he didn't want a felony. He didn't want a felony and he didn't want a sex offense. Those were the two sticking points for him. And he wouldn't have gotten a sex offense had he pleaded to aggravated domestic battery. But he would have gotten a felony. But he wasn't properly informed. So had he known that he would certainly have gotten at least 12 years... Well, wait a minute. Certainly have gotten 12 years. He went to trial and said he was not guilty. I mean, there were facts here in the record that supported him. This was not a lay-down trial. But he confessed to the police officer that I did this on the way in the ambulance. He confessed to the police officer that he had sex with his ex-girlfriend. And his ex-girlfriend said, yeah, we engaged in these rape fantasies in the past. And he's saying, look, this was just a rape fantasy. It wasn't a rape. It was a rape fantasy. He said that he surreptitiously gained entry to the apartment, posing as a John, and that's what he told the police officer. So he admitted to non-consensual activity. He admitted that to the officer. And there was an order of protection. There was a no-contact order. So obviously, no contested fact there that he violated those orders, that he got into a disguise. So the evidence is quite overwhelming. That doesn't mean that he raped his ex-girlfriend. I'm sorry? That doesn't mean that he raped his ex-girlfriend. Yes, he confessed to all that. I mean, in other words, I think the facts at trial were a little bit closer than you're trying to make them out to be in hindsight. I think the evidence is pretty overwhelming. There's a very strong probability he would have been convicted on those facts in light of a confession to a police officer, in light of the fact there was an order of protection. By the way, do you know why you had a bench trial here? I'm sorry? Do you know why there was a bench trial? I wasn't the attorney. I didn't have any involvement in that decision. I'm just curious about that. It seemed odd to me in a case like this. Yeah. Well, that might have been another problem that trial counsel did. I mean, she did a lot of things wrong. All right. Well, thank you. Thank you, Mr. Levin. Thank you, Your Honor. All right. The case will be taken under advisement.